IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 13–cv–03258–PAB–KMT

KATHY WORNICKI and
EDWARD LANE,
on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

BROKERPRICEOPINION.COM, INC.,
FIRST VALUATION, LLC,
FIRST VALUATION SERVICES, LLC, and
FIRST VALUATION TECHNOLOGY, LLC,

      Defendants.

---

# ORDER

---

      This matter is before the court on "Plaintiffs' Motion for Leave to Amend Second Amended Complaint to Add a Party and to Conduct Additional Discovery" (Doc. No. 81 ["Mot."], filed October 15, 2015.)  Plaintiffs seek to amend their Second Amended Complaint in order to add two parties, Walter Coats, Defendants' founder and CEO, and ValuTech, Inc., as well as two claims based on fraud and misrepresentation.  (Mot. at 1.)  Defendants filed a Response objecting to Plaintiffs' Motion (Doc. No. 92 ["Resp."], filed November 13, 2015) and Plaintiffs replied (Doc. No. 95 ["Reply"], filed December 1, 2015.)

**Procedural Background**

Plaintiffs initially filed this action on December 2, 2013 as a class action on behalf of licensed real estate professionals ("brokers") who performed real estate evaluations on behalf of Defendant Brokerpriceopinion.com ("BPO").  (*See generally* Doc. No. 1.)  Plaintiffs assert breach of contract and unjust enrichment claims, as well as a claim under the Colorado Consumer Protection Act and a claim for declaratory judgment.  (*Id.*)  In support of these claims, Plaintiffs allege that pursuant to work agreements with brokers, BPO is supposed to pay each of them within 60 days of performing real estate evaluations on BPO's behalf.  (*Id.*)  However, the brokers are consistently not receiving payment.  (*Id.*)  They also allege that BPO and the other three named Defendants are alter egos of each other that share a unity of interest and ownership. (*Id.*)

Plaintiffs previously amended their Complaint on February 18, 2014 and filed a Second Amended Complaint on May 29, 2014. (Doc. Nos. 23, 45.)  Defendants filed a Motion to Dismiss on June 29, 2014 challenging the jurisdiction of the court and Plaintiffs' request for class action certification.  (Doc. No. 49.)  The pending Motion to Dismiss notwithstanding, the parties were permitted to perform Phase 1 of discovery beginning June 25, 2014 and the deadline to amend pleadings was set for 45 days after a ruling on the Motion to Dismiss.  (Doc. No. 42, 43.)  At a Scheduling Conference held on December 2, 2014, Plaintiffs' counsel acknowledged a misunderstanding on his part regarding the parameters of the Phase 1 discovery, misconstruing the court's previous Order as permitting discovery only as to those issues related to the Motion to Dismiss.  The court denied Defendants' Motion to Dismiss on March 23, 2015, thereby setting

the deadline to amend pleadings as May 7, 2015.  (Doc. No. 42, 43, 58.)  The court subsequently

set the new discovery deadline for October 3, 2015.  (Doc. No. 70).

Plaintiffs filed their Motion to Amend on October 15, 2015, well after the deadline to

amend pleadings expired.  They contend that they first became aware of various evidence

supporting their request to add Walter Coats under an alter ego theory of liability, as well as

evidence supporting the two proposed new claims of fraud and misrepresentation, during the

parties' Rule 30(b)(6) depositions held on September 22 and 24, 2015.  (Mot. at 2, 4-5, 7.)

Additionally, Plaintiffs assert they were not aware of ValuTech, Inc.'s existence as an additional

alter ego of Defendants prior to October 5, 2015, two days after the close of discovery, when

Defendants supplemented previous discovery responses.  (Mot. at 5, 7.)

**Legal Analysis**

Plaintiffs' motion implicates both Fed. R. Civ. P. 15(a)(2) and 16(b)(4), as well as their

interplay, and Plaintiffs' failure to comply with basic legal conventions.

**A.  Failure to Attach Proposed Amended Complaint**

Because Plaintiffs have already filed a Second Amended Complaint, to which Defendants

have filed an Answer, Plaintiffs may amend their "pleading only by leave of court . . . ."  Fed. R.

Civ. P. 15(a).  Obviously, the court must be able to review a proposed amendment to a complaint

in order to determine its viability under the applicable law.  However, Plaintiffs have failed to

submit a copy of their proposed Third Amended Complaint with their Motion to Amend.

The court may deny a motion to amend a complaint for failure to submit the proposed

amendment.  *See Lambertson v. Utah Dep't of Corrs.,* 79 F.3d 1024, 1029 (10th Cir. 1996)

(district court did not abuse its discretion in denying plaintiff's motion to amend for failure to

provide adequate explanation for delay in seeking amendment and failure to provide copy of the proposed amended pleading). *See also Fleming v. Molloy,* Case No. 07–cv–00118–MSK-CBS, 2007 WL 3254389, at *1 (D. Colo. Oct. 31, 2007) (motion to amend complaint denied for failure to attach proposed amended complaint.); *Bownes v. City of Gary, Indiana,* 112 F.R.D. 424, 425 (N.D. Ind. 1986) ("common sense" dictates that a party seeking leave to amend should accompany his motion with a copy of the proposed amended complaint); *Williams v. Wilkerson,* 90 F.R.D. 168, 170 (E.D. Va. 1981) (where plaintiff sought leave to amend, a copy of the proposed amended pleading must be attached to the motion). While Plaintiffs have generally described the two new parties they propose to add to the case, as well as the two new claims, they have not attached a copy of a proposed Third Amended Complaint.

While this failure on the part of Plaintiffs could, and should, be grounds to summarily deny the motion at this juncture, this court declines to take that route because: (1) this failure can easily be corrected by re-submitting the motion and correctly attaching the proposed Amended Complaint; (2) a new submission would require the parties to re-submit and perhaps revise their briefing on the issue; and, (3) it is already late in the prosecution of this litigation and delay occasioned by this administrative failure would be detrimental to the interests of justice. Therefore, the court will address the merits of the motion to amend.

**B.  Fed. R. Civ. P. 16**

Because Plaintiffs filed their motion after the May 7, 2015 deadline for amending the pleadings, *supra*, the court employs a two-step analysis, first determining whether Plaintiffs have shown good cause to modify the scheduling order under Federal Rule of Civil Procedure 16(b),

and then evaluating whether Plaintiff has satisfied the standard for amendment of pleadings under Federal Rule of Civil Procedure 15(a).[1]  This court has stated:

> Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that the scheduling deadlines cannot be met despite a party's diligent efforts. In other words, this court may modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension.

*Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (citations and internal quotations omitted).

Defendants argue that the Tenth Circuit has repeatedly affirmed the denial of similar motions filed more than one year after the initial pleading is filed.  (Resp. at 4.)  However, the cases upon which Defendants rely do not establish the bright line rule they implicate.  In *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1366 (10th Cir. 1993), the Tenth Circuit affirmed the denial of a motion to amend where the party seeking amendment knew about the basis to add an additional party well before the deadline to amend pleadings had passed.  Similarly, in *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452 (10th Cir. 1991), the Tenth Circuit affirmed denial of the

---

[1] The court employs this two-step analysis, notwithstanding the fact that the Tenth Circuit "has not yet decided whether a party seeking to amend its pleadings after the scheduling order deadline must show 'good cause' for the amendment under Rule 16(b) in addition to the Rule 15(a) requirements." *Strope v. Collins*, 315 F. App'x 57, 62 n.4 (10th Cir. 2009) (internal quotation omitted); *cf. Bylin v. Billings*, 568 F.3d 1224, 1231 n.9 (10th Cir. 2009) (acknowledging that "[m]ost circuits have held that when a party amends a pleading after a deadline set by a scheduling order, Rule 16 and its 'good cause' standard are implicated.") (collecting cases); *Minter v. Prim Equip. Co.*, 451 F.3d 1196, 1205 n.4 (10th Cir. 2006) (citing *SIL–FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1518–19 (10th Cir. 1990)) (explaining that the Tenth Circuit "adopted a similar interpretation of Rule 16(b)'s 'good cause' requirement in the context of counterclaims asserted after the scheduling order deadline, but has not yet done so in the context of an amendment to the complaint").

plaintiff's motion to amend noting that it was filed 17 months after the filing of the original

complaint, the plaintiff offered no explanation for the delay, and the lower court had noted that

"no new evidence that was unavailable at the original filing had come to the plaintiff's

attention." *Id.* at 1462.

Plaintiffs contend that they did not learn of evidence supporting the addition of Mr. Coats

as a party, nor of evidence supporting the addition of misrepresentation and fraud claims, until

the September 2015 depositions.  In those depositions, Plaintiffs learned that Mr. Coats

contributes $80,000.00 per month to BPO to pay broker contracts.  (Doc. No. 79-5 at 14, 21-23;

Doc. No. 79-8 at 6, 8, 17-18, 20.)  The $80,000.00 monthly contributions represent the entire

budget used to pay broker contracts each month, even though the average amount owed to

brokers per month is $200,000.00.  (*Id.*)  BPO owes between $6 and 8 million to Mr. Coats and

that same amount is outstanding to brokers. (*Id.*)  Plaintiffs also learned that BPO does not have

a formal budget or financial plan, nor any identifiable plan to become solvent or pay the amount

owed to brokers.  (Doc. No. 79-5 at 16, 26; Doc. No. 79-8 at 7-8.)  BPO does not provide any

information to brokers that it is unlikely they will be paid for the work performed on behalf of

BPO, even though Mr. Coats concedes there is only a 50/50 chance this will occur.  (Doc. No.

79-5 at 24, 27.)

With regard to the addition of ValuTech, Inc., Plaintiffs explain that they did not learn of

its existence until October 5, 2015, following the close of discovery.  On that date, Plaintiffs

received supplemental discovery responses from Defendants that included Declaration Sheets

related to liability insurance policies, marking the first time Plaintiffs were aware of ValuTech,

Inc.'s existence.  The Declaration Sheets indicated that BPO changed its designation of the

named insured at least as early as 2012 to "ValuTech, Inc." and "ValuTech, Inc. dba First

Valuation." (Doc. No. 80-3, Doc. No. 80-4, Doc. No. 80-5.)  The Sheets further showed that

ValuTech, Inc. is located at the same address as the other Defendants and like the other

Defendants is in the business of providing "real estate valuation services for others for a fee."

(Doc. No. 80-2, Doc. No. 80-3, Doc. No. 80-4, Doc. No. 80-5.)

Defendants do not argue Plaintiffs were aware of any of this evidence prior to late

September 2015 and October 5, 2015.  Instead, Defendants contend Plaintiffs should have

engaged in discovery related to these issues "during the nearly eighteen months preceding

October 2015 to 'learn' of the facts which give rise to their proposed amendment."  (Resp. at 6.)

Defendants' contention is unavailing.  It is clear from the record that Plaintiffs did engage in

discovery related to these very issues and Defendants were simply not forthcoming.

Defendants never deny that the discovery responses they supplemented on October 5,

2015 that identified ValuTech, Inc. were for discovery requests Plaintiffs issued in March 2014

wherein they requested documents "relating to insurance coverage of the acts alleged" in the

current lawsuit.  (Doc. No. 95-2 at 5, Request No. 15).  Defendants offer no explanation as to

why they did not submit the responsive documents to Plaintiffs until October 5, 2015.

Similarly, Defendants do not contend that Plaintiffs were aware of the evidence

pertaining to the addition of Mr. Coats and the new claims prior to late September 2015.  More

significantly, it appears the new evidence was also the subject of the March 2014 discovery

requests but Defendants were not forthcoming with relevant responses.  For example, Plaintiffs

requested financial information "referring or relating to the amount of late or unpaid payments."

(Mot. at 6; Reply at 2.)  In response, BPO produced its Accounts Payable Ledger but no

documents or other materials related to the $80,000.00 monthly contributions by Mr. Coats. (*Id.*) In light of the fact that these contributions are the sole source of funds to pay the brokers each month and Plaintiffs' claim the perpetual inadequacy of the same has resulted in late or unpaid payments totaling over $7 million, such information is relevant to the request. Because Defendants withheld this information, Plaintiffs did not learn of these contributions until the September 2015 depositions.[2]

Finally, continuing this pattern of failing to fully respond to discovery requests, in correspondence between counsel dated August 20, 2015, Plaintiffs' counsel memorialized a conversation in which defense counsel indicated "no responsive documents exist" to a discovery request seeking documents regarding the nature of the relationship between the Defendant entities. (Doc. No. 95-4 at 2.) Defense counsel specifically indicated that "none of the entities had articles of incorporation or LLC operating agreements." (*Id.*) In the Response to Plaintiffs' current Motion, Michael Poole, identified by Mr. Coats as BPO's Chief Financial Officer, and Mr. Coats, each state in their respective Affidavits, "Each Defendant maintains separate corporate books and records which include, at a minimum, the articles of incorporation/organization for each entity, required annual reports and any other required filings." (Doc. No. 92-1 at 3, ¶ 9; Doc. No. 92-2 at 3, ¶ 9.)

---

[2] In both their Motion and Reply, Plaintiffs cite to Defendants' Response to Requests for Production No. 5 as evidence that they previously requested financial information "referring or relating to the amount of late or unpaid payments." (Mot. at 7; Reply at 5; Doc. No. 79-44 at 3; Doc. No. 95-2 at 2.) However, the attached exhibits that include Request No. 5 do not reflect such a request, nor is it included in any of the remaining requests for production reflected therein. Nevertheless, in their Response to Plaintiffs' Motion, Defendants did not indicate that they never received a discovery request seeking the indicated financial information, nor that they did not submit Accounts Payable Ledgers in response to the same, as Plaintiffs have stated.

It appears from the record that there are also other requested documents Defendants have either not produced or at least did not produce prior to the September 2015 depositions.  In the Rule 30(b)(6) deposition, Plaintiffs' counsel inquired as to whether Defendants searched for requested documents they would have received from the Better Business Bureau.  (Doc. No. 95-5 at 20.)  Defendants' corporate representative indicated that he thought they had in fact searched for those documents and that the same would have been located in accounting.  Subsequent discussion between counsel indicates that no such documents had been submitted to Plaintiffs. (Doc. No. 95-5 at 21-22).

The court finds Plaintiffs have shown good cause to modify the scheduling order as it pertains to the deadline for amendment of the pleadings.  "The fact that a party first learns, through discovery or disclosures, information necessary for the assertion of a claim after the deadline to amend established in the scheduling order has expired constitutes good cause to extend that deadline." *Pumpco, Inc.*, 204 F.R.D. at 668–69.  It appears the late date for Plaintiffs' request to amend is the result of Defendants' delays, rather than Plaintiffs'.  In any event, the court finds that even with diligent efforts, Plaintiffs could not have met the deadline for amending its Second Amended Complaint.

## C.  Fed. R. Civ. P. 15

Once Plaintiffs have shown good cause for modifying the scheduling order, they must also satisfy the requirements of Rule 15(a) for amending the pleadings. Under Rule 15(a), a court should allow a party to amend its pleadings "when justice so requires." Fed. R. Civ. P. 15(a). The grant or denial of an opportunity to amend is within the discretion of the court, but "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise

of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank*, 3 F.3d at 1365. However, "Rule 15(a) does not restrict a party's ability to amend its pleadings to a particular stage in the action." *Id*. at 1205.

### 1.   Undue Prejudice

Defendants argue that they will suffer undue prejudice if Plaintiffs are permitted to amend their complaint in the manners proposed. Prejudice under Rule 15 "means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Comm'rs of Lewes,* 416 F.2d 290, 300 (3rd Cir.1969); *see also LeaseAmerica Corp. v. Eckel*, 710 F.2d 1470, 1474 (10th Cir.1983). The party opposing the amendment of the pleadings has the burden of showing prejudice. *Beeck v. Aquaslide 'N' Dive Corp.*, 562 F.2d 537, 540 (8th Cir. 1977). The prejudice with which the Rule is concerned is the prejudice to the party's ability to prosecute or defend.

Prejudice to Defendants should the court allow amendment at this late juncture was summarized by Defendants in their Response as follows:

> For nearly two years, Defendants have engaged in a course of litigation strategy based upon the identity of the Defendants named in Plaintiffs' Complaint. Defendants have conducted discovery accordingly and, in particular, have not engaged in discovery in respect of the proposed new parties. Defendants have invested nearly two years and substantial resources in reliance upon Plaintiffs' Complaint and the claims and parties asserted therein. Defendants have submitted to two discovery periods based upon those claims and parties and have incurred substantial costs and fees in connection with that discovery. Plaintiffs' proposed amendment renders wasted the substantial resources Defendants have invested in pursuing a litigation course based upon Plaintiffs' Complaint and the parties and

claims set forth therein. The proposed amendment is manifestly prejudicial to
Defendants because it would require Defendants to adopt a litigation strategy and
to conduct substantial discovery that differs from the course Defendants have
followed in the two years since this case was first filed.

(Resp. at 5-6). Defendants also complain that 90 days' extended discovery would be an
insufficient amount of time to "adequately prepare a defense in respect of the proposed new
parties." (Resp. at 6, n.1.) Plaintiffs contend Defendants will not suffer prejudice because the
proposed parties are already known to Defendants, the proposed claims do not raise significant
new factual issues and the additional discovery would be essentially limited to Defendants' own
operations. (Reply at 8.)

The "most important[ ] factor in deciding a motion to amend the pleadings[ ] is whether
the amendment would prejudice the nonmoving party." *Minter v. Prime Equip.*, 451 F.3d 1196,
1207-08 (10th Cir. 2006) (citing *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir.
1991) ("As a general rule, a plaintiff should not be prevented from pursuing a valid claim . . . ,
provided always that a late shift in the thrust of the case will not prejudice the other party in
maintaining his defense upon the merits." (internal quotations omitted)). "Most often,
[prejudice] occurs when the amended claims arise out of a subject matter different from what
was set forth in the complaint and raise significant new factual issues." *Minter*, 451 F.3d at
1208.

The court finds that the subject matter of Plaintiffs' proposed amendments are
substantially similar to the subject matter underlying Plaintiffs' original claims and parties.
Plaintiffs' proposed amendments retain similar factual issues underlying their individual claims,
but now also allege that misrepresentation and fraud on the part of Defendants were involved
within those facts. Additionally, the court finds that the addition of ValuTech, Inc. should result

in little prejudice to Defendants as it appears likely ValuTech, Inc. is merely a business entity

operated by the same parties and in the same manner as the current Defendants.  Finally, the

addition of Mr. Coats under a theory of alter ego liability tends to change the shift of this action

more than the other proposed amendments.  However, the court concludes Defendants have

sufficient time to adjust and any prejudice resulting from the delay in adding this theory of

liability might have been avoidable if not for Defendants' own actions or inactions during the

discovery process.  Accordingly, the court finds Defendants will not be unduly prejudiced if

Plaintiffs' Motion is granted.

**2.  Futility**

Proposed amendments are futile when the amended complaint "would be subject to

dismissal for any reason, including that amendment would not survive a motion for summary

judgment." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240–41 (10th Cir. 2001).  As

reflected in the parties' briefing herein, the applicable standard for assessing the futility of a

proposed amendment is not entirely settled.  Defendants cite to case law indicating that a

proposed amendment should be considered futile when it would not withstand a motion to

dismiss for failure to state a claim or when it would not survive a summary judgment motion.

(Resp. at 6-7.)  Plaintiffs never directly address the applicable standard in their Motion but cite to

*Francis v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 10-cv-02105-REB-KLM, 2010 WL

5094224, at *1 (D. Colo. Dec. 8, 2010), which unequivocally states that futility is assessed based

on whether the proposed amendment would survive a motion to dismiss.  (Mot. at 10.)  In their

Reply, however, Plaintiffs reference the evidence supporting their proposed amendment as

creating "issues of fact," seemingly in reference to a summary judgment standard.  (Reply at 9,

10.)  Notwithstanding *Watson, supra,* the Tenth Circuit has at other times indicated that "[t]he futility question is functionally equivalent to the question of whether a complaint may be dismissed for failure to state a claim." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir.1999). Other courts have attempted to resolve this seeming conflict by considering the stage of the litigation before deciding which standard to apply. *Street v. Curry Bd. of Cnty. Comm'rs*, No. Civ. 06–0776 JB/KBM, 2008 WL 2397671, at *13 (D.N.M. Jan. 30, 2008). Nevertheless, the court finds it need not resolve this apparent conflict because, as discussed *infra*, even applying a summary judgment standard, the court finds the proposed amendments are not futile.

Defendants argue that addition of the proposed parties is futile because Plaintiffs cannot meet their burden of establishing an alter ego theory of liability.[3]  Under Colorado law, an alter ego relationship exists, allowing for the piercing of the corporate veil, when the corporation is a "mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist."  *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (citing *Krystkowiak v. W .O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004)).

In establishing whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder as alter egos, the court's first inquiry is to consider a variety of factors, including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the

---

[3] Defendants' argument focused solely on whether Plaintiffs can establish a viable alter ego theory of liability and never address the futility of the individual claims related to misrepresentation and fraud, apparently conceding the viability of each if Plaintiffs are permitted to add Mr. Coats as a party.

business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders

disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003) (citing *Newport Steel Corp. v. Thompson*,

757 F.Supp. 1152, 1156 (D. Colo. 1990)).  These factors reflect the underlying principle that the

court should only pierce when the corporate form has been abused.  *Phillips*, 139 P.3d at 644.

Notably, Plaintiffs are not required to show that every factor weighs in favor of finding a

unity of interest, nor do they have to establish that every element of Defendants' corporate

structure and practice has to be an improper subterfuge.  "It is the cumulative effect of the owner

actions that are relevant to the determination of whether the corporation is a mere instrumentality

for owner's own personal affairs and whether there is such unity of interest in ownership that the

separate personalities no longer exists.  Each action  - whether a legal act or not – [] has a

bearing on the assessment, even if standing alone they are not dispositive."  *Western*

*Convenience Stores, Inc. v. Thielen, et. al.*, No. 09-cv-02626-LTB-BNB, 2011 WL 866755, at

*10 (D. Colo. March 14, 2011).

The following evidence establishes disputed questions of material fact regarding whether

Mr. Coats and ValuTech, Inc. are alter egos of Defendants.  Mr. Coats is the sole owner,

operator, officer and shareholder of each Defendant, is the primary person running the same and

has sole decision-making authority.  (Doc. No. 79-5 at 7-9; Doc. No. 95-5 at 6.)  In Affidavits,

Mr. Coats stated that he "consults with" people on a management team prior to making decisions

and Mr. Poole confirmed that the management team advises Mr. Coats with respect to business

and managerial decisions.  (Doc. No. 92-1 at 3, ¶11; Doc. No. 92-2 at 3, ¶11.)  However, the

depositions made clear that no-one other than Mr. Coats has the ability to make any final

decisions.  (Doc. No. 79-5 at 7-9; Doc. No. 79-8 at 4, 9.)  There is also evidence suggesting that members of the management team have limited access to information from other departments. (Doc. No. 79-7 at 3, 6, 9; Doc. No. 79-8 at 23-24.)  As one example, Ms. May, BPO's Chief Operating Officer, was unaware until the September 2015 depositions, that BPO owes brokers between $6 and $ 7 million.  (Doc. No. 79-7 at 3, 6, 9.)  Mr. Poole, identified by Mr. Coats as BPO's Chief Financial Officer, indicated that he is not allowed access to information from accounting.  (Doc. No. 79-5 at 8; Doc. No. 79-8 at 22-24.)  Ultimately, the only person who has access to information across companies and departments and with authority to make business and management decisions is Mr. Coats.  (Doc. No. 79-5 at 7-9; Doc. No. 79-8 at 4, 9.)

The existence, role and structure of Defendants' corporate management is unclear.  In his deposition, Mr. Coats identifies Mr. Poole as BPO's Chief Financial Officer.  (Doc. No. 79-5 at 8.)  In Mr. Poole's Affidavit, he identifies himself as "the controller of First Valuation, LLC and Cartel Asset Management, Inc." and as "responsible for bookkeeping for the other Defendants, and for ValuTech, Inc."  (Doc. No. 92-1 at 1, ¶ 2.)

As discussed *supra*, BPO is severely undercapitalized.  Mr. Coats contributes personal funds in the amount of $80,000.00 per month, which is the sole budget for BPO to pay brokers. This lawsuit arises from the fact that this monthly contribution is inadequate, but to the extent BPO pays its brokers at all, it could not do so without Mr. Coats' monthly contribution.  BPO currently owes Mr. Coats between $6 and $ 8 million, and it owes the same amount to brokers. (Doc. No. 79-5 at 14, 21-23; Doc. No. 79-8 at 6, 8, 17-18, 20.)

BPO has neither a formal budget nor a financial plan.  Nor does BPO have any identifiable plan to become solvent or pay the amount owed to brokers.  (Doc. No. 79-5 at 16, 26; Doc. No. 79-8 at 7-8.)

Evidence suggests Defendant entities do not maintain separate corporate books and records.  As noted, Defendants previously maintained that they did not have articles of incorporation or LLC operating agreements.  However, in their Response to Plaintiffs' Motion, Mr. Poole and Mr. Coats both indicated there are articles of incorporation for each entity.  (Doc. No. 92-1 at 3, ¶9; Doc. No. 92-2 at 3, ¶9; Doc. No. 95-4 at 2.)  In spite of Defendants' previous declaration that they do not have any documents pertaining to the relationship between the entities, they now state that they maintain separate corporate books and records and although they do share resources, "[a]ny sharing arrangement [] is documented and recorded to reflect the ownership of every such resource."  (Doc. No. 92-1 at 2, ¶ 6; Doc. No. 92-2 at 2, ¶ 6; Doc. No. 95-4 at 2.)

Contradictory evidence exists with regard to whether Defendant entities, with the exception of BPO, are merely shell companies.  In their Affidavits, Mr. Poole and Mr. Coats stated that each Defendant "is operated by a team of individuals who make management and business decisions collectively."  (Doc. No. 92-1 at 3, ¶10; Doc. No. 92-2 at 3, ¶10).  These statements tend to establish that each entity is currently active, being operated by said management team.  However, they also state that only BPO is actively engaged in business, but they continue reporting requirements for each company.  (Doc. No. 92-1 at 3, ¶¶ 10, 11; Doc. No. 92-2 at 3, ¶¶ 10, 11).  In his deposition, Mr. Poole specifically stated that Defendant First Valuation Technology, LLC, is a "shell entity" and that "no activity has ever been pursued or

taken place in that entity." (Doc. No. 95-3 at 9). Similarly, Mr. Coats testified that Defendants

First Valuation Technology, LLC and First Valuation Services, LLC do not really exist and that

Cartel Asset Management has not existed, except for in name, since 2004. (Doc. No. 95-5 at 18-

19.) Mr. Coats further testified that First Valuation Services, LLC and BPO are interchangeable,

and that First Valuation is also lacking any officers or directors. (Doc. No. 95-5 at 7-8.)

Based on this evidence, the court finds Plaintiffs have sufficiently established disputed

questions of fact at this stage of the proceeding regarding whether the corporate Defendants are

the alter egos of Mr. Coats and ValuTech, Inc.[4]

The court's second inquiry when assessing whether to disregard a corporate fiction is

whether justice requires recognizing the substance of the relationship between the shareholder

and corporation over the form because the corporate fiction was "used to perpetrate a fraud or

defeat a rightful claim." *Contractors Heating & Supply Co. v. Scherb*, 432 P.2d 237, 239 (1967).

"Only when the corporate form was used to shield a dominant shareholder's improprieties may

the veil be pierced." *Phillips*, 139 P.3d at 644.

Defendants contend Plaintiffs have offered no evidence that their corporate structure was

used to perpetrate a wrong. (Resp. at 12-13.) In their Reply, Plaintiffs argue that BPO engages

brokers to do the work that provides BPO's sole source of outside revenue, all the while knowing

that BPO cannot pay for their work and that it has no identifiable plan for becoming solvent. At

the same time, BPO manufactures monthly secured debt for Mr. Coats, provides him with an

---

[4] The court recognizes that there is little evidence pertaining directly to ValuTech, Inc.; however, that is possibly due to the late date upon which Plaintiffs were made aware of its existence. In light of its designation as the insured entity on Defendants' liability insurance policy, its business description and location mirroring those of the other Defendants and Mr. Poole's designation as bookkeeper for BPO and ValuTech, Inc., clearly questions of fact exist as to whether it's an alter ego of BPO.

annual salary, plus occasional distributions and also provides an annual salary to Mr. Coats' friends and daughter.  (Reply at 4, 8.)  While this may not be enough to secure a judgment at trial, this evidence does create a question of fact as to whether the corporate structure is being used to perpetrate a fraud against Plaintiffs.

Third, the court must evaluate whether an equitable result will be achieved by disregarding the corporate form and holding the shareholder personally liable for the acts of the business entity.  *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1004 (Colo. 1998).  Achieving an equitable result is the paramount goal of piercing the corporate veil.  *Phillips*, 139 P.3d at 644.

It is apparent that equity favors allowing Plaintiffs to amend their Complaint and present evidence in this matter related to piercing the corporate veil.  It is alleged that BPO owes Plaintiffs and the other brokers over $7 million.  The brokers are BPO's only creditor besides Mr. Coats.  The facts demonstrate that BPO's ability to pay its broker contracts is dependent upon Mr. Coats.  *See U.S. ex rel. Wright v. Cleo Wallace Ctrs.*, 132 F.Supp.2d 913, 929 (D. Colo. 2000).  It is further alleged that BPO is severely undercapitalized and has not been solvent since 2007 and that while Mr. Coats, BPO's only other creditor, holds secured debt gaining interest, the brokers, who contracted to work for BPO and provide its only source of revenue, are not earning interest on their contracts, were not aware of BPO's insolvency and are unlikely to receive payment.

Although Plaintiffs' substantive allegations may ultimately prove insufficient, based solely on the evidence and argument currently presented and resolving all ambiguities in

Plaintiffs' favor, the court finds Plaintiffs have established disputed issues of material fact regarding the proposed parties and claims and the legal theories upon which they rely.

Accordingly, it is

**ORDERED** that "Plaintiffs' Motion for Leave to Amend Second Amended Complaint to Add a Party and to Conduct Additional Discovery" (Doc. No. 81) is **GRANTED**.  It is further

**ORDERED** that the parties shall have an additional 90 days from the date of this Order to conduct discovery pertaining to Defendants' financial and corporate operations.

Dated this 20th day of January, 2016.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge